STATE OF CONNECTICUT *v.* DAMON FAGAN
(SC 17562)

Sullivan, C. J., and Norcott, Katz, Vertefeuille and Zarella, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued January 3—officially released September 26, 2006

*Jane E. Carroll*, special public defender, with whom was *Mary Trainer*, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *James E. Thomas*, state's attorney, and, on the brief, *Herbert E. Carlson, Jr.*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Damon Fagan, appeals from the judgment of conviction, rendered after a jury trial, of one count of criminal violation of a protective order in violation of General Statutes § 53a-223,[1] one count of reckless driving in violation of General Statutes § 14-222,[2] and one count of attempt to escape or elude a

---

[1] General Statutes § 53a-223 (a) provides in relevant part: "A person is guilty of criminal violation of a protective order when an order issued pursuant to subsection (e) of section 46b-38c . . . has been issued against such person, and such person violates such order."

[2] General Statutes § 14-222 (a) provides: "No person shall operate any motor vehicle upon any public highway of the state, or any road of any specially chartered municipal association or of any district organized under the provisions of chapter 105, a purpose of which is the construction and maintenance of roads and sidewalks, or in any parking area for ten cars or more or upon any private road on which a speed limit has been established in accordance with the provisions of section 14-218a or upon any school property recklessly, having regard to the width, traffic and use of such highway, road, school property or parking area, the intersection of streets and the weather conditions. The operation of a motor vehicle upon any such highway, road or parking area for ten cars or more at such a rate of

police officer in violation of General Statutes § 14-223 (b),[3] and from the judgment revoking his probation imposed on a previous conviction after a trial to the court. On appeal, the defendant challenges his conviction under § 53a-223 on the ground that the state failed to proffer sufficient evidence for the jury to have found that he had violated the protective order. In addition, the defendant claims that the trial court improperly enhanced, pursuant to General Statutes § 53a-40b,[4] his sentence for violating § 14-223 (b). Finally, the defendant claims that the trial court improperly revoked his probation and imposed the remaining unexecuted portion of his sentence resulting from a prior conviction. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. On June 24, 2003, the defendant was arrested and charged with disorderly conduct on the basis of a complaint by Karen Johnson, the mother of his child, from whom he is estranged. He was released on a $15,000 bond, and a protective order was issued barring the defendant from coming within 100 yards of Johnson.

speed as to endanger the life of any person other than the operator of such motor vehicle, or the operation, downgrade, upon any highway, of any motor vehicle with a commercial registration with the clutch or gears disengaged, or the operation knowingly of a motor vehicle with defective mechanism, shall constitute a violation of the provisions of this section. The operation of a motor vehicle upon any such highway, road or parking area for ten cars or more at a rate of speed greater than eighty-five miles per hour shall constitute a violation of the provisions of this section."

[3] General Statutes § 14-223 (b) provides in relevant part: "No person operating a motor vehicle, when signalled to stop by an officer in a police vehicle using an audible signal device or flashing or revolving lights, shall increase the speed of the motor vehicle in an attempt to escape or elude such police officer. . . ."

[4] General Statutes § 53a-40b provides: "A person convicted of an offense committed while released pursuant to sections 54-63a to 54-63g, inclusive, or sections 54-64a to 54-64c, inclusive, other than a violation of section 53a-222, may be sentenced, in addition to the sentence prescribed for the offense to (1) a term of imprisonment of not more than ten years if the offense is a felony, or (2) a term of imprisonment of not more than one year if the offense is a misdemeanor."

At approximately 11 p.m. on July 27, 2003, the department of children and families received a call from an individual purporting to be the defendant and claiming that he had shot Johnson. Police officers from the Hartford police department subsequently were dispatched to Johnson's home at 59 Lenox Street in Hartford. Officer Giuseppe Uccello and several other officers arrived at Johnson's home at approximately 1:30 a.m. and found her unharmed. While in Johnson's home, Uccello observed the defendant's car, which had been described to the police by Johnson, passing directly in front of the home. Uccello then entered his police car and followed the defendant's car until it stopped at his home at 154 Edgewood Street in Hartford, which was one block away from Johnson's home. Uccello activated his overhead lights and pulled up behind the defendant's car. The defendant immediately sped off and led Uccello and other responding officers on a high speed chase that ended with the defendant's apprehension on Edgewood Street, near his home.

As a result of the defendant's conduct in the early morning hours of July 28, 2003, he was charged, in part A of a two part information, with one count of second degree harassment in violation of General Statutes § 53a-183 (a) (3), one count of criminal violation of a protective order in violation of § 53a-223, one count of reckless driving in violation of § 14-222, one count of attempt to escape or elude a police officer in violation of § 14-223 (b), one count of attempt to assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (1), and one count of attempt to assault a public safety officer in violation of General Statutes §§ 53a-49 (a) (2) and 53a-167c (a) (1). In part B of the information, the defendant was charged with being subject to a sentence enhancement under § 53a-40b for committing an offense while released on bond. A jury trial was held on part A of the information,

after which the defendant was found guilty of criminal violation of a protective order, reckless driving, and attempt to escape or elude a police officer. The jury acquitted the defendant on the remaining three counts. After the jury had rendered its verdict on part A of the information, the defendant entered a plea of guilty on part B of the information. The trial court rendered judgment in accordance with the jury's verdict and sentenced the defendant to prison terms of five years, execution suspended after one year, for violation of the protective order, thirty days for reckless driving, and one year for attempt to escape or elude a police officer, said sentences to be served consecutively. The court also sentenced the defendant to a one year sentence enhancement pursuant to § 53a-40b. In addition, because the trial court found that the defendant had violated a condition of his probation stemming from a 1999 conviction, the trial court revoked the defendant's probation and imposed the full six year unexecuted portion of the defendant's 1999 sentence to be served consecutive to the sentence imposed under the present conviction. This appeal followed.[5] Additional facts will be set forth as necessary.

I

The defendant first claims that the state failed to proffer sufficient evidence for the jury to find him guilty of violating the June, 2003 protective order. The defendant does not challenge that he was subject to a valid protective order issued pursuant to General Statutes § 46b-38c (e)[6] and that he, in fact, violated the protective order's provision ordering him to "[r]efrain from coming within 100 yards of [Johnson]." Rather, the defendant

---

[5] The defendant appealed from the judgment of the trial court to the Appellate Court, and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[6] The trial court took judicial notice of the fact that the protective order was issued pursuant to § 46b-38c (e).

claims that the jury reasonably could not have found that he had the requisite intent to violate the protective order's condition that he refrain from coming within 100 yards of Johnson because there was no evidence that the defendant knew that Johnson was home when he drove down her street.[7] In response, the state contends that, although there was no direct evidence of the defendant's intent to come within 100 yards of Johnson, it proffered ample circumstantial evidence from which the jury reasonably could have inferred such an intent. We agree with the state.

This court has held that proof of the criminal violation of a protective order pursuant to § 53a-223 "merely requires the issuance of a protective order against the defendant pursuant to § 46b-38c (e) . . . and the defendant's violation of that order." State v. Wright, 273 Conn. 418, 432, 870 A.2d 1039 (2005). This court has not considered previously whether a violation of § 53a-223 (a) requires that the act constituting the violation of the protective order be accompanied by a specific mens rea.

The Appellate Court, however, has considered this question on numerous occasions, and it has concluded that, "a violation of a protective order does not incorporate the specific intent to harass. . . . All that is necessary is a general intent that one intend to perform the

---

[7] The defendant acknowledges that his insufficiency of the evidence claim was not preserved properly at trial. Typically, a defendant can prevail on an unpreserved claim of constitutional error only if he or she satisfies all four prongs of the test this court set forth in State v. Golding, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). See part II B of this opinion setting forth the four prongs of the Golding test. This court has stated previously, however, that "any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of Golding." State v. Adams, 225 Conn. 270, 275 n.3, 623 A.2d 42 (1993). Accordingly, because there is no practical significance in analyzing an unpreserved claim of insufficiency of the evidence under the Golding rubric, we review such a claim as we would any properly preserved claim. Id.

activities that constitute the violation." (Internal quotation marks omitted.) *State* v. *Hafsal*, 94 Conn. App. 741, 745, 894 A.2d 372 (2006); *State* v. *Binnette*, 86 Conn. App. 491, 497, 861 A.2d 1197 (2004), cert. denied, 273 Conn. 902, 868 A.2d 745 (2005); accord *State* v. *Hersey*, 78 Conn. App. 141, 162, 826 A.2d 1183, cert. denied, 266 Conn. 903, 832 A.2d 65 (2003); *State* v. *Charles*, 78 Conn. App. 125, 130–31, 826 A.2d 1172, cert. denied, 266 Conn. 908, 832 A.2d 73 (2003). The Appellate Court further has explained that, "[h]aving declined to adopt the argument that criminal responsibility for the violation of a protective order requires specific intent, we have not, nevertheless, held that the statute is one of strict liability. Rather, we believe that it is a general intent statute, requiring proof that one charged with its violation intended to perform the activities that constituted a violation of the protection order.

"General intent is the term used to define the requisite mens rea for a crime that has no stated mens rea; the term refers to whether a defendant intended deliberate, conscious or purposeful action, as opposed to causing a prohibited result through accident, mistake, carelessness, or absent-mindedness. Where a particular crime requires only a showing of general intent, the prosecution need not establish that the accused intended the precise harm or precise result which resulted from his acts." (Internal quotation marks omitted.) *State* v. *Charles*, supra, 78 Conn. App. 131.

We agree with the Appellate Court that the intent required to prove a violation of § 53a-223 (a) is only that the defendant intended to perform the activities that constituted the violation of the protective order. In the present case, the activity that constituted the violation of the protective order was coming within 100 yards of Johnson. Thus, the state needed to prove that the defendant came within 100 yards of Johnson and

that this act resulted from intentional conduct rather than accident or mistake.

The following additional facts are necessary to determining whether the state met this burden. At trial, Johnson offered the following testimony. She previously had a relationship with the defendant for approximately seven years and during the course of their relationship, they had a child together. At some subsequent point in time, their relationship became hostile. On July 27, 2003, Johnson worked at Hartford Hospital, her place of employment, until 11:30 p.m. and she returned to her home after work. She had lived at the Lenox Street address for thirty years. At approximately 1:30 a.m. on July 28, 2003, police officers had come to her home to check on the well-being of her and her child.

The state also presented evidence that, at approximately 11 p.m. on July 27, 2003, a male identifying himself as the defendant had called the hotline for the department of children and families (department) and stated that he just had shot and killed the mother of his child when she got home from work.[8] Johnson identified the male voice on the recording of the telephone call as that of the defendant. Roxana Cileza, the employee for the department who had received the hotline call, testified that, based on information available to the department, she had determined that the individual to whom the caller was referring was Johnson. Cileza testi-

---

[8] The tape-recorded telephone call was admitted into evidence and contained the following exchange:

"Operator: Good evening, [department of children and families], can I help you?

"Caller: I would like to report someone.

"Operator: Can I have your name please?

"Caller: Damon Fagan.

"Operator: Excuse me.

"Caller: Damon Fagan. . . . I need to let you know I just killed my baby['s] mother—she just got off from work and I just shot her in her face."

fied that, due to the concern raised by this telephone call, she had contacted the Hartford police department.

Officer Uccello offered the following testimony as to the defendant's conduct. He and other officers were dispatched to Johnson's home to check on her well-being. While Uccello was interviewing Johnson in her home, he observed the defendant's car pass in front of her home at a distance of no more than thirty-three feet from Johnson. After seeing the defendant drive past Johnson's home, Uccello entered his marked police patrol car, followed the defendant for approximately thirty seconds until the defendant had reached his home, which was one block from Johnson's home. Uccello pulled his car behind the defendant's car with the lights on his patrol car activated, at which point the defendant immediately sped away. Uccello and other responding police officers[9] testified that the defendant had led them on a high speed chase through Hartford and Bloomfield for more than ten minutes before he eventually was apprehended near his home. These officers testified that, during the pursuit, the defendant's vehicle had reached speeds in excess of seventy miles per hour, at one point reaching 100 miles per hour, that the defendant had continued to try to elude police even after his tire had blown out, and that he had driven in the dark without his headlights on. At the conclusion of the state's case, the defendant declined to present any evidence.

We next turn to whether this evidence was sufficient for the jury to have concluded that the defendant had the requisite intent to perform the activity that constituted the violation of the protective order—coming within 100 yards of Johnson. "In reviewing a sufficiency

[9] In addition to Uccello, the other responding police officers who testified for the state were Michael Kot, Shawn Nichols, Edward Stor and Nazario J. Figueroa.

of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 177–78, 891 A.2d 897 (2006). "Indeed, direct

evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 239–40, 745 A.2d 800 (2000). "[A]ny such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 93, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

Turning to the present case, we conclude that, construing the evidence in the light most favorable to sustaining the verdict, the state presented sufficient evidence of the defendant's conduct and other circumstantial evidence from which the jury reasonably could have inferred that the defendant had the intent to come within 100 yards of Johnson, irrespective of his purpose for doing so. Common sense and experience dictate, and the record in the present case does not contradict the fact, that most people, including the mother of a young child, such as Johnson, are likely to be in their homes in the middle of the night and that the defendant equally would have been aware of this fact. Thus, the defendant's decision to drive past Johnson's home at 1:30 a.m., given the likelihood that Johnson would be home at such a late hour, justifies the inference that the defendant intended to come within 100 yards of her as he drove past her home.[10]

---

[10] Even if we were to assume that the defendant knew that Johnson was working until 11:30 p.m., this inference is not weakened because experience and common sense also would dictate that Johnson was likely to return home after work given the late hour at which she left work. The two hours between the end of Johnson's work shift and the time at which the defendant drove by her home were more than ample time for her to return to her home from her job. Further, the record contains no other evidence that would make it unreasonable for the jury to infer that the defendant believed she would have gone home directly after work.

Although this fact alone provides a reasonable basis to infer that the defendant had the requisite intent to come within 100 yards of Johnson, the record reveals additional evidence that further strengthens this inference. In particular, the state presented the undisputed evidence that the defendant's immediate reaction to Uccello's marked patrol car pulling up behind him with its overhead lights activated was to speed away and engage in a high speed chase that lasted for more than ten minutes. The defendant's flight from the police is circumstantial evidence from which the jury could infer reasonably that the defendant was conscious that he was guilty of violating the condition of the protective order. See *State* v. *Coltherst*, 263 Conn. 478, 521–22, 820 A.2d 1024 (2003) (unexplained flight is circumstantial evidence that tends to prove consciousness of guilt); *State* v. *Ferrara*, 176 Conn. 508, 517, 408 A.2d 265 (1979) ("flight of the person accused of crime is a circumstance which, when considered together with all the facts of the case, may justify an inference of the accused's guilt" [internal quotation marks omitted]). In addition, there was testimony from numerous witnesses that, despite the fact that it was 1:30 a.m., the headlights on the defendant's car were off when he drove by Johnson's house and during the ensuing high speed chase. It is reasonable to infer from this fact that the defendant kept his headlights off as he passed Johnson's home in an effort to avoid detection. This behavior also supports a reasonable inference of a guilty conscience.

The final evidence adduced by the state that supports the inference that the defendant intended to come within 100 yards of Johnson was that the defendant was identified as the person who had called the department's hotline and had stated that he just shot the mother of his child. In conjunction with the fact that the defendant shortly thereafter drove by Johnson's house, a jury reasonably could have inferred that the

defendant's presence on Johnson's street just hours after making this telephone call was an intentional effort to see the effect wrought on Johnson by his call to the hotline. In sum, we conclude that the state proffered sufficient circumstantial evidence for the jury to infer that the defendant had intended to come within 100 yards of Johnson.

The defendant claims, however, that the state's evidence was insufficient because it merely establishes that the defendant's actions in coming within 100 yards of Johnson were the result of carelessness or absent-mindedness. Specifically, the defendant contends that the state's circumstantial evidence does not support the inference that the defendant was intending to come within 100 yards of Johnson, but instead supports the inference that he reflexively was taking the most direct route to his home. In support of this contention, the defendant points to three pieces of evidence. First, the defendant drove down Johnson's street even though several police cars were present. Second, he calmly pulled up to his home before Uccello's patrol car pulled up behind him. Third, Johnson lived one block over from the defendant and both of the streets on which they lived are one way streets running in opposite directions. We disagree with the defendant.

Although the evidence cited by the defendant could support an inference that he did not purposefully drive down Johnson's street in order to come within 100 yards of her, the defendant misapplies the standard by which we review sufficiency of the evidence claims. "On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Sorabella*, supra, 277 Conn. 177. For the reasons we have discussed previously, we conclude

that there is a reasonable view of the evidence from which the jury inferred that the defendant had intended to come within 100 yards of Johnson.

## II

The defendant next claims that the trial court's imposition of a one year sentence enhancement under § 53a-40b; see footnote 4 of this opinion; was improper on two grounds. First, the defendant claims that the sentence enhancement was improper because he was not given written notice, as required by General Statutes § 54-64e (b),[11] that, if he were to be convicted of an offense committed while released on bond, he could be subject to a sentence enhancement. Second, the defendant claims that the sentence enhancement was improper because his guilty plea to having violated § 53a-40b by committing a crime while released on bond resulted from a constitutionally inadequate plea canvass and, therefore, was not a knowing and voluntary plea. We conclude that the trial court properly imposed the enhanced sentence.

The following additional undisputed facts are relevant to the resolution of these claims. Prior to his release on probation in May, 2003, the defendant had signed a form stating the conditions of his release. That form did not contain an advisement that the defendant could be subject to a sentence enhancement if convicted of a crime committed while on release. Thereafter, the defendant was charged, in the present case, in a two part information. In part B of the information, the state charged the defendant with committing a crime while released on bond in violation of § 53a-40b.

[11] General Statutes § 54-64e (b) provides in relevant part: "When any person is released pursuant to the provisions of sections 54-63a to 54-63g, inclusive, or sections 54-64a to 54-64c, inclusive, such person shall be notified in writing at the time of release . . . (4) that any crime committed while on release may subject him to enhanced penalties pursuant to section 53a-40b."

The state also filed, approximately one week prior to trial, an enhancement warning, which had advised the defendant that the state was going to seek an additional term of imprisonment pursuant to § 53a-40b if he was convicted of a felony or misdemeanor at trial. In the enhancement warning, the state alleged that such an enhancement would be factually warranted because the defendant was released on bond from his June, 2003 disorderly conduct arrest when he allegedly committed the crimes for which he was charged in part A of the information.

After the jury returned guilty verdicts on three of the six counts set forth in part A of the information, the court excused the jury and instructed the clerk to put the defendant to plea on part B of the information, which charged that the defendant was subject to a sentence enhancement under § 53a-40b. The defendant entered a plea of guilty, which the trial court accepted without conducting a canvass. The court subsequently enhanced the defendant's sentence for attempt to escape or elude a police officer by an additional year pursuant to § 53a-40b.[12]

A

We first turn to the defendant's nonconstitutional claim that the trial court improperly enhanced his sentence under § 53a-40b because, upon his release from custody after his June, 2003 arrest for disorderly conduct, the defendant had not received the written notification required under § 54-64e that he might be subject to a sentence enhancement if convicted of a crime committed while on release. The defendant contends that these provisions are ambiguous as to whether the notice requirement under § 54-64e is a legal predicate to the

---

[12] The trial court, in the exercise of its discretion under § 53a-40b, did not enhance the defendant's sentence on the other two counts on which he was found guilty.

application of § 53a-40b to enhance the defendant's sentence. The defendant urges us to resolve this ambiguity against the state and cites to federal case law in support of such a construction. Specifically, he notes that there is a split of authority among the federal Circuit Courts of Appeals that have considered this question as applied to the federal scheme, but asserts that the courts that have held that the notice requirement is not a legal predicate to application of the sentence enhancement provision have reached that conclusion solely on the ground that the federal enhancement provision is a *mandatory*, self-executing provision of law.[13] Because, under our state scheme, § 53a-40b gives the trial court discretion to impose a sentence enhancement and is, therefore, not a mandatory, self-executing provision of law, the defendant claims that the federal case law supports his construction of the statute.

The defendant concedes, however, that he did not raise this claim before the trial court and therefore seeks plain error review. "[T]he plain error doctrine, which is now codified at Practice Book § 60-5 . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's

---

[13] Specifically, the defendant points to the following decisions of the federal Circuit Courts of Appeals that have held that the failure to comply with 18 U.S.C. § 3142 (h), a provision requiring that persons on release be notified of potential sentence enhancements, bars the imposition of such a sentence enhancement as provided for under 18 U.S.C. § 3147: *United States* v. *Onick*, 889 F.2d 1425, 1433 (5th Cir. 1989); *United States* v. *DiCaro*, 852 F.2d 259, 264–65 (7th Cir. 1988); and *United States* v. *Cooper*, 827 F.2d 991, 994–95 (4th Cir. 1987). The defendant also cites the following decisions of the federal Circuit Courts of Appeals that have concluded that the failure to give notice does not bar the imposition of the sentence enhancement: *United States* v. *Kentz*, 251 F.3d 835, 838 (9th Cir. 2001); *United States* v. *Lewis*, 991 F.2d 322, 323–24 (6th Cir. 1993); and *United States* v. *DiPasquale*, 864 F.2d 271, 281 (3d Cir. 1988).

judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . Implicit in this very demanding standard is the notion, explained previously, that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review." (Citations omitted; internal quotation marks omitted.) *State* v. *Kirk R.*, 271 Conn. 499, 507–508 n.14, 857 A.2d 908 (2004). "[Thus, a] defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 235 n.85, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

We conclude that the trial court's alleged impropriety in imposing an additional one year sentence under § 53a-40b in the absence of written notice in compliance with § 54-64e does not constitute one of the "truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Kirk R.*, supra, 271 Conn. 507–508 n.14. At the outset, we note that the defendant never brought to the trial court's attention the fact that he had not received written notice of the possibility of a sentence enhancement when he was released on bond from the June, 2003 disorderly conduct charges. Rather, the defendant simply pleaded

guilty to committing an offense while on release in violation of § 53a-40b.

Even if we were to assume, however, that the lack of written notice was known by the trial court, we cannot conclude that the court's imposition of the sentence enhancement under § 53a-40b was such a clear and obvious impropriety that requires reversal of the judgment under the plain error doctrine. The defendant essentially concedes that, by their express terms, § 53a-40b does not condition its application on compliance with § 54-64e, nor does § 54-64e provide that the failure to comply with that section deprives the trial court of discretion to impose a sentence enhancement under § 53a-40b. In addition, the question of whether compliance with the notice provision of § 54-64e is a legal predicate to the application of § 53a-40b is an issue of first impression. Thus, we cannot conclude that the trial court committed a clear and obvious error by exercising its discretion under the express provisions of a presumptively valid statute. See *State* v. *Pierce*, 269 Conn. 442, 453, 849 A.2d 375 (2004) (not plain error for trial court to find that defendant had committed felony for sexual purposes and require defendant to register with sex offender registry pursuant to General Statutes § 54-254 when trial court complied with § 54-254 as written); *Scanlon* v. *Connecticut Light & Power Co.*, 258 Conn. 436, 442 n.9, 782 A.2d 87 (2001) (not plain error for trial court to submit to jury claim of emotional distress arising from harm negligently caused to livestock, pets or property in part because this court previously had not considered whether jury may award damages for such claims). Indeed, the split of federal authority cited by the defendant, although not directly relevant, merely underscores this conclusion. We therefore conclude that the trial court did not commit plain error by enhanc-

ing the defendant's sentence despite his lack of written notice as required under § 54-64e.[14]

## B

We next turn to the defendant's claim that the trial court's imposition of an additional one year sentence enhancement under § 53a-40b was improper because the court failed to canvass the defendant adequately, in violation of his due process rights, to ensure that his guilty plea on part B of the information was made knowingly and voluntarily. Specifically, the defendant contends that the trial court failed to inform him that he had the right to have a jury determine whether the crimes for which he had been convicted in part A of the information were committed while he was on release. At the outset, the defendant concedes that this claim was not preserved in the trial court, but he seeks to prevail under the test set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[15] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the follow-

---

[14] We stress, however, that our decision is limited to whether the trial court committed an error so clear and obvious that it would necessitate the invocation of the plain error doctrine to reverse the judgment of the trial court. Because we conclude that the trial court's imposition of a sentence enhancement was not such a clear and obvious error, we do not reach the merits of the defendant's claim that compliance with § 54-64e is a legal prerequisite to the application of § 53a-40b. Accordingly, our decision today should not be read as rejecting the defendant's claim on the merits. See *Santopietro* v. *New Haven*, 239 Conn. 207, 216, 682 A.2d 106 (1996) (explaining significance of determination of standard of review; noting that whether trial court has committed plain error that requires reversal is quite different than whether trial court has made ruling that is legally incorrect and that is sufficiently harmful to require reversal of judgment).

[15] The state contends that, because the defendant raised on appeal only the argument that his plea was not knowing and voluntary, he has waived his claim that the guilty plea constitutionally was defective. This contention lacks merit because "[t]he general rule is that, absent a statutory exception, a plea of guilty . . . constitutes a waiver of all defects in the prosecution *except those involving the canvass of the plea* . . . ." (Emphasis added.) *State* v. *Reddick*, 224 Conn. 445, 451, 619 A.2d 453 (1993).

ing conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Heredia*, 253 Conn. 543, 559–60, 754 A.2d 114 (2000).

The record in the present case is adequate for our review because it contains the full transcript of the trial court hearing at which the defendant pleaded guilty to part B of the information. Further, this court previously has recognized that a claim of an inadequate plea canvass implicates the defendant's due process rights and, therefore, is of constitutional magnitude. See *State* v. *Reid*, 277 Conn. 764, 781, 894 A.2d 963 (2006). Accordingly, we conclude that the merits of the defendant's claim are reviewable under the first two prongs of *Golding*.

Turning to the third prong of the *Golding* analysis, we first set forth the applicable principles that guide our analysis of the defendant's claim. "It is axiomatic that unless a plea of guilty is made knowingly and voluntarily, it has been obtained in violation of due process and is therefore voidable. . . . A plea of guilty is, in effect, a conviction, the equivalent of a guilty verdict by a jury. . . . [As noted in the United States Supreme Court's decision in *Boykin* v. *Alabama*, 395 U.S. 238, 243, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), the defendant, in] choosing to plead guilty . . . is waiving several constitutional rights, including his privilege against self-

incrimination, his right to trial by jury, and his right to confront his accusers. . . . The *Boykin* constitutional essentials for the acceptance of a plea of guilty are included in our rules and are reflected in Practice Book §§ [39-19[16] and 39-20].[17] . . . Those rules provide that the trial court must not accept a guilty plea without first addressing the defendant personally in open court and determining that the defendant fully understands the items enumerated in § 39-19, and that the plea is made voluntarily pursuant to § 39-20." (Citation omitted; internal quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 200–201, 842 A.2d 567 (2004). "These considerations demand the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and its consequences. . . . We, therefore, require the trial court affirmatively to clarify on the record that the defendant's guilty plea was

---

[16] Practice Book § 39-19 provides: "The judicial authority shall not accept the plea without first addressing the defendant personally and determining that he or she fully understands:

"(1) The nature of the charge to which the plea is offered;

"(2) The mandatory minimum sentence, if any;

"(3) The fact that the statute for the particular offense does not permit the sentence to be suspended;

"(4) The maximum possible sentence on the charge, including, if there are several charges, the maximum sentence possible from consecutive sentences and including, when applicable, the fact that a different or additional punishment may be authorized by reason of a previous conviction; and

"(5) The fact that he or she has the right to plead not guilty or to persist in that plea if it has already been made, and the fact that he or she has the right to be tried by a jury or a judge and that at that trial the defendant has the right to the assistance of counsel, the right to confront and cross-examine witnesses against him or her, and the right not to be compelled to incriminate himself or herself."

[17] Practice Book § 39-20 provides: "The judicial authority shall not accept a plea of guilty or nolo contendere without first determining, by addressing the defendant personally in open court, that the plea is voluntary and is not the result of force or threats or of promises apart from a plea agreement. The judicial authority shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the prosecuting authority and the defendant or his or her counsel."

made intelligently and voluntarily." (Citations omitted; internal quotation marks omitted.) *State* v. *Garvin*, 242 Conn. 296, 310, 699 A.2d 921 (1997).

We never have considered previously whether the same due process protections that apply to a defendant's guilty plea to substantive offenses apply equally to a guilty plea to part B of an information charging the defendant with a sentence enhancement based on the fact that the defendant was released on bond from an arrest at the time he committed the subsequent offense. As we have discussed previously herein, a plea canvass is required when a defendant pleads guilty because, by doing so, he or she is waiving several constitutional rights, including the privilege against self-incrimination, the right to trial by jury, and the right to confront his or her accusers. Therefore, a plea canvass was required in the present case if, in fact, any of the aforementioned constitutional rights attached to the proceeding at which the defendant's exposure to a sentence enhancement under § 53a-40b was under consideration. Specifically, in the present case, the defendant contends that he was entitled to a jury finding on the question of whether he was released on bond from an arrest at the time he committed the present offense.

We begin with certain well established fundamental principles. A two part information is required under our rules of practice whenever the state seeks an enhanced penalty. Practice Book § 36-14. The purpose of this rule is to ensure that the defendant is given adequate notice of the charge against him so that he properly may prepare his defense. See *State* v. *Jones*, 234 Conn. 324, 339, 662 A.2d 1199 (1995); *State* v. *LaSelva*, 163 Conn. 229, 233–34, 303 A.2d 721 (1972); *State* v. *Fitzgerald*, 54 Conn. App. 258, 262, 737 A.2d 922 (1999), rev'd on other grounds, 257 Conn. 106, 777 A.2d 580 (2001); see also *State* v. *Ferrone*, 96 Conn. 160, 173–75, 113 A. 452 (1921) (determining method for setting forth these allegations:

first part of information to allege commission of current violation; and second part to allege prior conviction, thereby allowing trier of fact to determine factual questions of first part, without knowledge of allegations in second part, and hence ensuring fair determination as to whether defendant committed current offense). Thus, although a prosecution involving a two part information requires two separate proceedings, it nevertheless remains a single prosecution under one information. See *State* v. *Silver*, 139 Conn. 234, 241, 93 A.2d 154 (1952) (characterizing process required under *Ferrone* as "a trial of a case in two successive stages"). The second part of the information must be proven, however, before the enhanced penalty can be imposed. *State* v. *LaSelva*, supra, 233–34.

In *Apprendi* v. *New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Blakely* v. *Washington*, 542 U.S. 296, 301–304, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), the United States Supreme Court held that a defendant who is subject to an enhanced penalty has a right to a jury finding on facts, other than the issue of whether he has a previous conviction. It seems clear that the *Apprendi* line of cases does not disturb this court's jurisprudence as to the notice and proof requirements of the two part information.[18] The question remains, however, whether *Apprendi* and its progeny would require that the defendant in this case be given a jury trial, or a plea canvass pursuant to *Boykin* before waiving that right, on the issue of whether he was on release from an arrest at the time he committed the crimes charged in part A of the infor-

---

[18] This court's early jurisprudence had held that, "[o]n the second part [of the information] the defendant must, separately and anew, plead, elect trial by court or jury, and choose whether or not to take the stand as a witness." *State* v. *Grady*, 153 Conn. 26, 33, 211 A.2d 674 (1965). This jurisprudence no longer remains good law to the extent that it was predicated on the federal constitution and contravenes the prior conviction exception to a jury trial under the *Apprendi* line of cases.

mation.[19] Under the reasoning expressed by *Apprendi* and its progeny, we conclude that, once convicted of having committed the crimes in part A of the information, the defendant's status at the time he committed those crimes involved a legal determination, not a factual one, and that, accordingly, he was not entitled to a jury trial on the issue of his status.

We, therefore, turn to *Apprendi* v. *New Jersey*, supra, 530 U.S. 460. In that case, the Supreme Court considered whether the trial judge properly had enhanced the defendant's sentence on the basis of its determination by a preponderance of the evidence that the defendant's criminal conduct had been motivated by racial bias, rather than based on a jury determination of that fact beyond a reasonable doubt. Id., 469–71. In concluding that this procedure was constitutionally deficient, the Supreme Court stated in sweeping language that the federal constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id., 490. As *Apprendi*'s progeny more specifically explained, judges are precluded from finding "additional facts" that increase a defendant's sentence beyond the "statutory maximum," which it defined as the maximum sentence a judge may impose *"solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."* (Emphasis in original.) *Blakely* v. *Washington,* supra, 542 U.S. 303; see id., 303–305 (concluding that judge unconstitution-

---

[19] The defendant's claim on appeal is limited to his right, under the federal constitution, to a separate judicial proceeding to determine whether he was on release from a prior arrest at the time he committed the crimes charged in the present case. Therefore, we do not consider whether such a proceeding is required under our state constitution. See *State* v. *Higgins,* 265 Conn. 35, 39 n.9, 826 A.2d 1126 (2003) (noting that, when defendant does not brief separately claim under Connecticut constitution, we limit our review to United States constitution).

ally imposed sentence beyond statutory maximum after finding that defendant had acted with deliberate cruelty in committing crime); see also *United States* v. *Booker*, 543 U.S. 220, 232, 120 S. Ct. 2348, 160 L. Ed. 2d 621 (2005) (concluding that 18 U.S.C. § 3553 [b] [1], which makes Federal Sentencing Guidelines mandatory, is incompatible with *Blakely* and must be invalidated).[20]

Although we are bound by the language in *Blakely* and *Apprendi* stating that only the fact of a prior conviction is exempt from being proven to a jury beyond a reasonable doubt, numerous federal courts that have applied *Apprendi* and its progeny have understood that these cases clearly do not limit a judge's authority to make legal determinations that precede a jury's fact-finding and imposition of sentence. See *United States* v. *Smith*, 422 F.3d 715, 723 (8th Cir. 2005) (noting that court consistently has rejected applicability of *Booker* to legal determination of whether prior conviction may be categorized as "crime of violence"), cert. denied sub

---

[20] The *Apprendi* court excepted the fact of a prior conviction from the general rule on the basis of its prior decision in *Almendarez-Torres* v. *United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998). In *Almendarez-Torres*, the defendant had entered a guilty plea to being found in the United States after being deported in violation of 8 U.S.C. § 1326 (a). Id., 226–27. Prior to the District Court accepting the defendant's guilty plea, the defendant "admitted that he had been deported, that he had later unlawfully returned to the United States, and that the earlier deportation had taken place 'pursuant to' three earlier 'convictions' for aggravated felonies." Id., 227. The government sought to have the defendant sentenced in accordance with 8 U.S.C. § 1326 (b), which provides for a sentence of up to twenty years imprisonment if the earlier deportation was the result of an aggravated felony conviction. Id. The defendant argued that he only could be sentenced up to the two year maximum of § 1326 (a) because his indictment did not mention the earlier aggravated felony convictions. Id. The court concluded that, because § 1326 (b) is a penalty provision and not a separate crime, the government was not required constitutionally to charge that factor in the defendant's indictment. Id., 226–27. The court also rejected the defendant's argument that the federal constitution requires that the fact of his prior convictions—or more generally recidivism—be treated as an element of the crime and therefore be stated in the indictment and proved to a jury beyond a reasonable doubt. Id., 239.

nom. *Jordan* v. *United States*, 546 U.S. 1127, 126 S. Ct. 1112, 163 L. Ed. 2d 921 (2006); *United States* v. *Brown*, 417 F.3d 1077, 1079 (9th Cir. 2005) (categorization of prior conviction as "violent felony" or "crime of violence" is legal question, not factual question, coming within purview of *Apprendi*, *Blakely* and *Booker*); *United States* v. *Mincks*, 409 F.3d 898, 901 (8th Cir. 2005) (whether prior conviction is violent felony under Armed Career Criminal Act of 1984, 18 U.S.C. § 924 [e], "is distinctly a question of law for the court, not a jury" under *Blakely* and *Booker*), cert. denied, 546 U.S. 1176, 126 S. Ct. 1345, 164 L. Ed. 2d 59 (2006); *United States* v. *Lewis*, 405 F.3d 511, 514 (7th Cir. 2005) ("[t]hat legal criteria ['what kind of crime is this?'] rather than factual inquiries ['what did this person do when violating that statute?'] identify a 'crime of violence' is the principal reason why the [prior convictions] proviso to *Booker* exists").

Additionally, several state courts have concluded that other facts, such as the defendant's status as being on probation or parole and the defendant's release date from prison, which may be used as a basis for a sentence enhancement, also fall within that exception because they arise from and essentially are legal determinations analogous to a prior conviction. See, e.g., *People* v. *Montoya*, Court of Appeals, Docket No. 03CA0696, 2006 Colo. App. LEXIS 220, *6–7 (Colo. App. February 23, 2006) (concluding that fact that defendant was on parole or probation is "inextricably linked to his prior conviction" and does not "implicate the type of prohibited fact-finding detailed in *Apprendi*"); *State* v. *Calloway*, 914 So. 2d 12, 14 (Fla. App. 2005) (concluding that "[f]or the purpose of applying *Apprendi* and *Blakely*, the date of a defendant's release from prison under the prison releasee reoffender statute is analogous to the fact of a prior conviction under the habitual felony offender statute" [internal quotation marks omit-

ted]), cert. denied, 547 U.S. 1080, 126 S. Ct. 1794, 164 L. Ed. 2d 534 (2006); *Ryle* v. *State*, 842 N.E.2d 320, 325 (Ind. 2005) (concluding that trial court's reliance on presentence investigation report to prove defendant was on parole is equivalent to reliance on "judicial record[s] that guarantee the conclusive significance that is the focus of *Apprendi*" [internal quotation marks omitted]); *State* v. *Allen*, 706 N.W.2d 40, 45 (Minn. 2005) (concluding that defendant's probation status was legal determination that did not violate *Apprendi*, reasoning that whether he was on probation at time of current offense arises from, and essentially is analogous to, whether he had prior conviction), cert. denied, 547 U.S. 1106, 126 S. Ct. 1884, 164 L. Ed. 2d 583 (2006).[21]

In *State* v. *Sanko*, 62 Conn. App. 34, 43, 771 A.2d 149, cert. denied, 256 Conn. 905, 772 A.2d 599 (2001), the only Connecticut case to touch upon this issue, the Appellate Court determined that the defendant was not deprived unconstitutionally of a jury trial when the trial court enhanced his sentence under § 53a-40b after the defendant's counsel had conceded at the sentencing hearing that the defendant was released on a written promise to appear following a conviction for a prior crime when he committed the subsequent offense. The court concluded that no jury trial was required because there was no issue of fact, noting that, in most instances, "a defendant's status under [§ 53a-40b] arises out of

---

[21] In *State* v. *Allen*, supra, 706 N.W.2d 48, the Minnesota Supreme Court referred to the defendant's probation status as a "fact," but treated it as one properly subject to a legal determination. That court's characterization of the defendant's legal status is consistent with the United States Supreme Court's decision in *Apprendi* similarly labeling a prior conviction a "fact" that properly is subject to a legal determination. See *Apprendi* v. *New Jersey*, supra, 530 U.S. 490 ("[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury"). Thus, the courts simply have recognized that certain facts are not reasonably subject to dispute and, therefore, properly may be determined as a matter of law.

some antecedent encounter with the criminal justice system. The record of that antecedent encounter is a judicial record of which a court may take judicial notice. See *State* v. *Carey*, 228 Conn. 487, 497, 636 A.2d 840 (1994)." *State* v. *Sanko*, supra, 44.

Similarly, in *Ryle* v. *State*, supra, 842 N.E.2d 324–25, the Indiana Supreme Court, in reliance on *Shepard* v. *United States*, 544 U.S. 13, 125 S. Ct. 1254, 161 L. Ed. 2d 205 (2005), wherein the Supreme Court reaffirmed, in accordance with *Apprendi*, the trial court's proper use of certain documents to determine the character of a prior conviction for sentence enhancement purposes, concluded that the trial court properly had found that the defendant was on parole based on prior judicial records as reflected in the presentence investigation report prepared by the probation officer because these types of judicial records bear the same hallmark of conclusive significance as those enumerated in *Shepard*. See also *United States* v. *Pineda-Rodriquez*, 133 Fed. Appx. 455, 458 (10th Cir. 2005) (holding that fact of date of defendant's release from custody and fact that defendant was on supervision during commission of current offense fall under prior conviction exception because they are " 'subsidiary findings' " that are "merely aspects of the defendant's recidivist potential . . . easily verified, and . . . [require] nothing more than official records, a calendar, and the most self-evident mathematical computation").

We recognize that other courts, however, have refused to extend the prior conviction exception to apply to such facts. In *State* v. *Gross*, 201 Ariz. 41, 44, 31 P.3d 815 (App. 2001), the Arizona Court of Appeals concluded that the enhancement of the defendant's sentence based on the trial court's finding that the defendant had committed the subsequent offenses while on release awaiting trial on a separate felony count violated *Apprendi*. The court reasoned that, because the fact

that the defendant was on release status resulted in a sentence beyond the statutorily prescribed maximum and fell outside the plain language of the "prior conviction" exception, *Apprendi* required that the defendant's release status be submitted to the jury and proved beyond a reasonable doubt. Id.; see also *State* v. *Wissink*, 172 N.C. App. 829, 837, 617 S.E.2d 319 (2005) (concluding that, although probationary status is not far removed from prior conviction, rule set forth in *Apprendi* requires this fact to be found by jury and noting that fact of probationary status "did not have the procedural safeguards of a jury trial and proof beyond a reasonable doubt recognized in *Apprendi* as providing the necessary protection for defendants at sentencing"); *State* v. *Perez*, 196 Or. App. 364, 371–73, 102 P.3d 705 (2004) (concluding that fact defendant was on parole or probation was related to prior conviction, but procedural safeguards discussed in *Apprendi* did not apply to this fact, and, therefore, fact must be proved to jury beyond reasonable doubt), rev'd on other grounds, 340 Or. 310, 131 P.3d 168 (2006); *State* v. *Jones*, 126 Wash. App. 136, 142–46, 107 P.3d 755 (2005) (concluding that whether defendant was in community placement at time offense was committed does not fall within prior conviction exception because procedural safeguards attaching to prior conviction are not satisfied and rejecting notion that prior conviction exception should be viewed to encompass facts *related* to past conviction because *Apprendi* plainly stated that exception was narrow). Some of these cases take a formalistic view of *Apprendi* and conclude that courts should not examine the nature of the fact in issue in deciding whether the defendant was entitled to a jury determination. See, e.g., *State* v. *Wissink*, supra, 837. In other cases, however, wherein the court apparently recognized a more nuanced and context driven approach, the application of the enhancement factor involved not

merely the defendant's status, but, rather, turned on a complicated and intensively factual inquiry that clearly would fall within the jury's traditional province. See, e.g., *State* v. *Jones*, supra, 142–46 (noting that community placement status involves many variables);[22] see also *Markwood* v. *Renard*, 203 Or. App. 145, 150, 125 P.3d 39 (2005) (noting that, under Oregon law, "an upward departure sentence based on a defendant's supervisory status 'requires further inferences about the malevolent quality of the offender and the failure of his [supervisory] status to serve as an effective deterrent' ").

In the present case, we conclude that the defendant's status as to whether he lawfully had been on release at the time of the offense for which he was convicted, a fact that he not only reasonably could not dispute but conceded in his briefs to this court, was a question that also did not require a jury determination. Under our rules of practice, a defendant may be released upon the execution of a written promise to appear or he may be released on bond. See generally Practice Book c. 38. Whether the defendant was released pursuant to a bond or his promise to appear and when he was so released

---

[22] In *State* v. *Jones*, supra, 126 Wash. App. 143–44, the court explained: "[W]hether one convicted of an offense is on community placement or community custody at the time of the current offense cannot be determined from the fact of a prior conviction. Too many variables are involved. For example, a defendant may receive credit for preconviction incarceration, the length of which may not be specified in the judgment and sentence. The defendant may receive additional credit for preconviction incarceration if the local detention facility awarded him good conduct time. And even if both of these determinations are in the relevant judgment and sentence, there is no possible way for the sentence to reflect whether the defendant will eventually become entitled to [e]arned release time . . . which may be as much as 50 percent of the sentence imposed. . . . When community placement ends can also vary. . . . [D]efendants may receive community custody in terms of a range of months or up to the period of earned release . . . whichever is longer. The high and low end of the range can differ by as much as two years." (Internal quotation marks omitted.)

are questions that properly can be answered by mere reference to the court file. Indeed, once the defendant was convicted under part A of the information, demonstrating that he had committed the crimes charged on the date specified, the only issue left open—whether he was on release from an arrest at the time—properly could have been the subject of judicial notice. See *McCarthy* v. *Warden*, 213 Conn. 289, 293, 567 A.2d 1187 (1989) ("[w]e may . . . take judicial notice of the court files in another suit between the parties, especially when the relevance of that litigation was expressly made an issue at this trial"), cert. denied, 496 U.S. 939, 110 S. Ct. 3220, 110 L. Ed. 2d 667 (1990). "The true conception of what is judicially known is that of something which is not, or rather need not be, the subject of either evidence or argument, unless the tribunal wishes it,—something which is already in the court's possession, or, at any rate, is so accessible that there is no occasion to use any means to make the court aware of it. 1 B. Holden & J. Daly, Connecticut Evidence (2d Ed. 1988), pp. 112–13." *Sivilla* v. *Philips Medical Systems of North America, Inc.*, 46 Conn. App. 699, 704 n.5, 700 A.2d 1179 (1997). That the defendant concedes in his briefs to this court the fact of his release at the time of the crimes alleged in part A of the information is merely a further demonstration of the propriety of judicial notice of the defendant's release status.[23] Therefore, because no jury determination was necessary and consequently no canvass pursuant to *Boykin* was required,

---

[23] Indeed, even if the defendant were entitled under *Apprendi* to a jury trial on this issue, the United States Supreme Court recently held that the failure to submit a sentencing factor to the jury is not a structural error requiring reversal, but, rather, is subject to harmless error analysis. See *Washington* v. *Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 2552–53, 165 L. Ed. 2d 466 (2006). It is clear that, given the judicial record evidencing that the defendant was on release at the time of the offenses for which he was convicted, along with his admission to that fact, the failure to submit this factor to a jury necessarily would be harmless error.

we conclude that the trial court properly enhanced the defendant's sentence upon his entering a plea of guilty.

III

The defendant next claims that the trial court abused its discretion in revoking the defendant's probation and reinstating the full six years remaining on his sentence for a 1999 conviction. Specifically, the defendant contends that it was excessive and unfair for the trial court to impose the full six year sentence on the basis of the defendant's two misdemeanor convictions for reckless driving and attempting to escape or elude a police officer. In addition, the defendant contends that the trial court failed to consider, in its determination of whether the purposes of probation could no longer be served, the specific circumstances surrounding the defendant's arrest on July 28, 2003. Specifically, the defendant asserts that his conduct on that night was not purposeful, but, rather, the result of frustration and panic stemming from his stormy relationship with Johnson, who he claims had made false accusations that led to his June, 2003 arrest on the charge of disorderly conduct. The defendant contends that his response to the police on July 28 was motivated by a fear that Johnson had made another false accusation that the police would credit, which would put his probation in jeopardy. We are not persuaded.

The following facts are necessary to the resolution of this claim. In 1999, the defendant pleaded guilty to carrying a pistol without a permit in violation of General Statutes § 29-35 (a) and possession of narcotics in violation of General Statutes § 21a-279 (a). He was sentenced to ten years imprisonment, execution suspended after four years, with five years probation. On January 2, 2003, the defendant, while on work release, was arrested for disorderly conduct stemming from an altercation with Johnson. He subsequently pleaded guilty to

this charge and was sentenced to sixty days to be served concurrently with the remainder of his 1999 sentence. On May 5, 2003, the defendant was released on probation. Later that month, the defendant submitted a urine sample to his probation officer that tested positive for marijuana. The defendant thereafter admitted to his probation officer that he had smoked marijuana the week prior to the urine test. On the basis of the defendant's drug use and his subsequent arrest for his conduct on July 27 and 28, 2003, the state filed a substitute information on May 11, 2004, charging the defendant with having violated the conditions of his probation of his 1999 sentence in violation of General Statutes § 53a-32.

After the jury returned its verdict, the trial court held an evidentiary hearing on the violation of probation charge. At the hearing's conclusion, the trial court found that the defendant had violated the conditions of his probation by using marijuana, violating the protective order, engaging in reckless driving, and attempting to escape or elude a police officer. The trial court then, with the parties' consent, combined the sentencing hearings for the 2003 charges on which the jury had convicted the defendant and for the violation of probation charge. At the conclusion of this combined hearing, because it concluded that the beneficial purposes of probation were no longer being served, the trial court revoked the defendant's probation and reinstated the remaining six years on the defendant's 1999 sentence.

The defendant acknowledges that this claim was not preserved in the trial court, and, accordingly, he seeks to appeal under *Golding*. We conclude that the record is adequate for review and the claim is of constitutional magnitude. See *State* v. *Davis*, 229 Conn. 285, 294, 641 A.2d 370 (1994) ("due process clause of the fourteenth amendment to the United States constitution requires that certain minimum procedural safeguards be

observed in the process of revoking the conditional liberty created by probation" [internal quotation marks omitted]). We further conclude, however, that the defendant's claim fails under *Golding*'s third prong because he has failed to demonstrate a clear constitutional violation.

We begin by setting forth the standard that guides our review of revocation of probation proceedings. "A revocation of probation hearing has two distinct components . . . . A factual determination by a trial court as to whether a probationer has violated a condition of probation must first be made. If a violation is found, a court must next determine whether probation should be revoked because the beneficial aspects of probation are no longer being served. . . . Since there are two distinct components of the revocation hearing, our standard of review differs depending on which part of the hearing we are reviewing." (Internal quotation marks omitted.) *State* v. *Faraday*, supra, 268 Conn. 185.

In the present case, the defendant concedes that the trial court correctly found that he had violated the conditions of his probation. He contends, however, that the trial court improperly revoked his probation and reinstated the six unexecuted years of his sentence for the 1999 conviction. We review a trial court's decision to revoke a defendant's probation by asking "whether the trial court exercised its discretion properly by reinstating the original sentence and ordering incarceration. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) Id., 185–86. "A defendant who seeks to reverse the exercise of judicial discretion assumes a heavy burden."

(Internal quotation marks omitted.) *State* v. *Carey*, 228 Conn. 487, 495, 636 A.2d 840 (1994).

Our determination of whether the trial court abused its discretion in revoking the defendant's probation is guided by the following principles. "We previously have recognized that [t]o a greater or lesser degree, it is always true of probationers . . . that they do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions. . . . These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large. . . .

"A revocation proceeding is held to determine whether the goals of rehabilitation thought to be served by probation have faltered, requiring an end to the conditional freedom obtained by a defendant at a sentencing that allowed him or her to serve less than a full sentence. . . . [T]he ultimate question [in the probation process is] whether the probationer is still a good risk . . . . This determination involves the consideration of the goals of probation, including whether the probationer's behavior is inimical to his own rehabilitation, as well as to the safety of the public." (Citations omitted; internal quotation marks omitted.) *State* v. *Hill*, 256 Conn. 412, 426–27, 773 A.2d 931 (2001).

Turning to the present case, we conclude that the trial court did not abuse its discretion in revoking the defendant's probation and reinstating the six year unexecuted portion of his 1999 sentence. Specifically, we conclude that the trial court reasonably could have found from the defendant's behavior before and after he was released on probation that he was no longer a "good risk." Id., 427. The record reveals that, while the defendant was on work release a few months prior to

being released on probation, he was arrested on a charge of disorderly conduct to which he pleaded guilty. In addition, just weeks after being released on probation, the defendant violated a condition of his probation by using marijuana. A violation of a probation condition requiring that a defendant remain free from drug use alone has been deemed a sufficient ground to revoke a defendant's probation. See *State* v. *Johnson*, 11 Conn. App. 251, 252, 259, 527 A.2d 250 (1987) (concluding that trial court did not abuse its discretion in revoking defendant's probation and imposing original sentence when condition of probation required defendant to remain free from drug use and he thereafter tested positive for cocaine use).

The defendant's subsequent probation violation, just two months after his release, constituted further grounds to revoke his probation. As determined by the trial court, the defendant violated his probation a second time when he was found guilty of violating a protective order, reckless driving, and attempting to escape or elude the police. The defendant's violation of a protective order was a felony, and we previously have stated that a felony conviction is a sufficient ground upon which to revoke a defendant's probation. See *State* v. *Pecoraro*, 196 Conn. 305, 307, 493 A.2d 180 (1985) (criminal conviction is "more than sufficient basis for revocation of probation"); *State* v. *Roberson*, 165 Conn. 73, 77, 327 A.2d 556 (1973) ("commission of a felony would . . . constitute a violation sufficient to authorize revocation of probation"). Moreover, the defendant's conduct that led to his convictions on the two misdemeanor charges—reckless driving and attempting to escape or elude a police officer—is more troubling because it evidences the defendant's willingness to put both police officers and the public at risk. Specifically, as recounted in part I of this opinion, the defendant led the police on a nighttime, high speed chase through

Hartford and Bloomfield, without his headlights on, and at speeds that reached 100 miles per hour. The defendant continued his attempt to evade the police even after one of the tires on his car had blown out. Thus, his behavior demonstrated a serious lack of concern for the safety of both the police officers involved in the chase and members of the public with whom the defendant may have come into contact. Accordingly, the trial court reasonably could have concluded that the defendant no longer was a good risk because his behavior was "inimical to his own rehabilitation, as well as to the safety of the public." (Internal quotation marks omitted.) *State* v. *Hill*, supra, 256 Conn. 427. We therefore conclude that the trial court did not abuse its discretion in revoking the defendant's probation and reinstating the remainder of his 1999 sentence.[24]

---

[24] To the extent that the defendant claims that it was excessive for the trial court to impose the full remaining six years of his 1999 sentence, we note that, "[t]he element of 'punishment' in probation revocation of [the] defendant is attributable to the crime for which he [or she] was originally convicted and sentenced. Thus, any sentence [the] defendant had to serve as the result of the [probation] violation . . . was 'punishment' for the crime of which he [or she] had originally been convicted. Revocation is a continuing consequence of the original conviction from which probation was granted." *State* v. *Smith*, 207 Conn. 152, 178, 540 A.2d 679 (1988). Accordingly, the defendant's argument is misplaced because the six year sentence is punishment for the criminal conduct that led to his 1999 conviction. As the state properly recognizes, a challenge to the length of the sentence should be made through the sentence review process under General Statutes § 51-195.

In addition, to the extent the defendant claims that the trial court abused its discretion because it failed to consider the specific circumstances under which he was acting on July 28, 2003, we conclude that this argument also lacks merit. During the sentencing hearing, the trial court allowed the defendant to address the court, wherein he described his belief that his relationship with Johnson, and more particularly her false statements that led to his June, 2003 disorderly conduct arrest, precipitated his behavior on that night. The trial court rejected the defendant's attempt to place the blame for his actions on Johnson. On the basis of the record of the defendant's behavior before and during his release on probation, we cannot conclude that the trial court abused its discretion in concluding that "the beneficial aspects of [the defendant's] probation no longer [were] being served." (Internal quotation marks omitted.) *State* v. *Faraday*, supra, 268 Conn. 185.

The judgments are affirmed.

In this opinion SULLIVAN, C. J., and NORCOTT and ZARELLA, Js., concurred.

VERTEFEUILLE, J., dissenting. Although I agree with parts I, II A and III of the majority opinion, I disagree with the majority's conclusion in part II B of its opinion that the trial court properly enhanced the sentence of the defendant, Damon Fagan, under General Statutes § 53a-40b, despite the fact that it failed to canvass the defendant to ascertain whether his guilty plea to part B of the information was made knowingly and voluntarily. Specifically, I disagree with the majority's underlying conclusion that no plea canvass was required constitutionally because the defendant was not entitled to have a jury find whether his sentence could be enhanced under § 53a-40b. Instead, I conclude that in accordance with the United States Supreme Court's decision in *Apprendi* v. *New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), a jury must find the operative fact that underlies the defendant's sentence enhancement under § 53a-40b, namely, whether he was released on bond at the time he committed the present offenses with which he is charged. Because I believe that the defendant would be entitled to a jury finding, I conclude that the trial court's failure adequately to canvass him prior to accepting his guilty plea violated his due process rights under the federal constitution. Thus, I would reverse the judgment of the trial court with respect only to the defendant's one year sentence enhancement under § 53a-40b, and would remand the case to the trial court with direction to permit the defendant to withdraw his guilty plea to part B of the information.

I agree with the majority that the issue of whether the defendant's due process right to a plea canvass was violated turns on whether the defendant was, by

pleading guilty, waiving his right to a jury trial on the factual issues that triggered the enhancement of his sentence under part B of the information. I further agree that this inquiry is controlled by the United States Supreme Court's decision in *Apprendi* and its progeny. I depart, however, from the reasoning of the majority opinion in its interpretation and application of the rule laid down in that case.

In *Apprendi*, the Supreme Court set forth the rule regarding when a defendant is entitled to a jury finding of facts that would increase his or her criminal penalty beyond the statutorily prescribed maximum. Id., 490. In that case, the defendant entered a guilty plea to two counts of second degree possession of a firearm for an unlawful purpose and one count of third degree unlawful possession of an antipersonnel bomb. Id., 469–70. The trial court subsequently held a hearing regarding the applicability of New Jersey's hate crime statute, which provides for an extended term of imprisonment if the trial judge finds by a preponderance of the evidence that "[t]he defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." (Internal quotation marks omitted.) Id., 468–69. The trial judge made the requisite finding under the hate crime statute and enhanced the defendant's sentence accordingly. Id., 471.

On appeal, the Supreme Court concluded that the New Jersey hate crime statute was unconstitutional because the due process clause of the fifth and fourteenth amendments to the United States constitution and the sixth amendment's right to a jury trial make it "unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be

established by proof beyond a reasonable doubt." (Internal quotation marks omitted.) Id., 490. Accordingly, the court established the following rule: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[1] Id.; accord *Blakely* v. *Washington*, 542 U.S. 296, 301–304, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) (invalidating defendant's sentence under rule set forth in *Apprendi* because sentence was enhanced beyond statutorily prescribed maximum on basis of trial court's determination that defendant acted with deliberate cruelty).

The *Apprendi* court excepted the fact of a prior conviction from the general rule on the basis of the Supreme Court's prior decision in *Almendarez-Torres* v. *United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998). In that case, the court concluded that the defendant could be subject to a longer prison sentence based on the fact that he had been previously convicted for "aggravated felonies," despite the fact that such prior convictions were not charged in the defendant's indictment.[2] Id., 226–27. In reaching this conclusion, the court rejected the defendant's argument that the federal constitution requires that the fact of his prior convictions also be proved to a jury beyond a reasonable doubt. Id., 239.

---

[1] The United States Supreme Court in *Blakely* v. *Washington*, 542 U.S. 296, 303, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), defined the maximum sentence to be "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Accordingly, the current rule, as set forth in *United States* v. *Booker*, 543 U.S. 220, 244, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), is that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."

[2] The factual background of the *Almendarez-Torres* decision is described in detail in footnote 20 of the majority opinion.

The court in *Apprendi* described *Almendarez-Torres* as "at best an exceptional departure from the historic practice"; *Apprendi* v. *New Jersey*, supra, 530 U.S. 487; of charging in an indictment all facts needed to inform the defendant of the crime charged and the subsequent penalty if found guilty, of trying such facts to a jury, and proving such facts to a jury beyond a reasonable doubt. Id., 476. The court also intimated that *Almendarez-Torres* was decided wrongly and if the fact of prior conviction had been contested it would need to be proved to a jury beyond a reasonable doubt, but it declined to revisit the case because the defendant did not challenge its validity. Id., 489–90. Instead, the court treated *Almendarez-Torres* as a narrow exception to the general rule requiring the jury to find any facts beyond a reasonable doubt that would increase the penalty beyond the statutorily prescribed maximum.[3] Id., 490.

The court reasoned that its decision in *Almendarez-Torres* could be excepted from the general rule that it was announcing because that decision "turned heavily upon the fact that the additional sentence to which the defendant was subject was the prior commission of a serious crime. . . . Both the certainty that procedural safeguards attached to any fact of prior conviction, and the reality that [the defendant in *Almendarez-Torres*] did not challenge the accuracy of that fact in his case, mitigated the due process and [s]ixth [a]mendment concerns otherwise implicated in allowing a judge to deter-

---

[3] Specifically, the court in *Apprendi* stated: "Even though it is arguable that *Almendarez-Torres* was incorrectly decided, and that a logical application of our reasoning today should apply if the recidivist issue were contested, [the defendant] does not contest the decision's validity and we need not revisit it for purposes of our decision today to treat the case as a narrow exception to the general rule we recalled at the outset. Given its unique facts, it surely does not warrant rejection of the otherwise uniform course of decision during the entire history of our jurisprudence." *Apprendi* v. *New Jersey*, supra, 530 U.S. 489–90.

mine a fact increasing punishment beyond the maximum of the statutory range." (Citations omitted; internal quotation marks omitted.) Id., 488; see also *Jones* v. *United States*, 526 U.S. 227, 249, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999) (noting that due process and sixth amendment concerns in *Almendarez-Torres* were mitigated because "unlike virtually any other consideration used to enlarge the possible penalty for an offense . . . a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees"). Indeed, the court noted that "there is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof." *Apprendi* v. *New Jersey*, supra, 530 U.S. 496.

Applying the plain language of the rule set forth in *Apprendi*, it is apparent that the fact of whether the defendant was released on bond from an arrest is not a fact of prior conviction and is therefore a fact that the due process clause and the sixth amendment require to be proved to a jury beyond a reasonable doubt. The Arizona Court of Appeals, in *State* v. *Gross*, 201 Ariz. 41, 44, 31 P.3d 815 (App. 2001), reached this same conclusion based on a sentence enhancement statute that is nearly identical to § 53a-40b. In that case, the defendant was convicted after a jury trial of two counts of forgery. Id. Prior to sentencing, the trial court took judicial notice of a Superior Court record and found that the defendant had committed the present offense while released on bond for another felony offense. Id., 43. Accordingly, the trial court enhanced the defendant's sentence by two years on each count pursuant to Arizona Revised Statutes Annotated § 13-604 (R) (West

2001), which provides in relevant part that "[a] person who is convicted of committing any felony offense, which felony offense is committed while the person is released on bail or on the defendant's own recognizance on a separate felony offense . . . shall be sentenced to a term of imprisonment two years longer than would otherwise be imposed for the felony offense committed while released on bond or on the defendant's own recognizance . . . ."

On appeal, the Court of Appeals concluded that the enhancement of the defendant's sentence based on the trial court's finding that the defendant committed the present offenses while on release awaiting trial on a separate felony charge violated *Apprendi*. *State* v. *Gross*, supra, 201 Ariz. 44. The court reasoned that, because the fact that the defendant was on release status resulted in a sentence beyond the statutorily prescribed maximum, the plain language of *Apprendi* required that the defendant's release status be submitted to the jury and proved beyond a reasonable doubt. Id. The court did acknowledge that it would be rather easy for the court to take judicial notice of a court record to determine the release date, but it concluded that "[u]nder *Apprendi*, it is a defendant's exposure to additional punishment, not the ease or accuracy with which that fact can be determined by a trial court, that is pivotal in triggering a defendant's right to have a jury decide." Id., 45.

Despite the narrow wording of the prior conviction exception to the general rule set forth in *Apprendi*, the majority correctly notes that some courts have concluded that other facts, such as the defendant's status as being on probation or parole and the defendant's release date from prison, also fall within that exception because they arise from and are essentially analogous to a prior conviction. See, e.g., *People* v. *Montoya*, Court of Appeals, Docket No. 03CA0696, 2006 Colo. App.

LEXIS 220, *6 (Colo. App. February 23, 2006) (concluding that "fact that [the] defendant was on parole or probation is inextricably linked to his prior conviction and thus falls within the prior conviction exception"); *State* v. *Calloway*, 914 So. 2d 12, 14 (Fla. App. 2005) (concluding that date defendant was released from prison falls within prior conviction exception because "it is directly derivative of a prior conviction"), cert. denied, 547 U.S. 1080, 126 S. Ct. 1794, 164 L. Ed. 2d 534 (2006); *State* v. *Allen*, 706 N.W.2d 40, 48 (Minn. 2005) (concluding that fact defendant was on probation "arises from, and is so essentially analogous to, the fact of a prior conviction, that constitutional considerations do not require it to be determined by a jury"), cert. denied, 547 U.S. 1106, 126 S. Ct. 1884, 164 L. Ed. 2d 583 (2006). These courts reason that, because these facts are bound up in the prior conviction to which constitutionally required procedural safeguards attached, the sixth amendment concerns expressed in *Apprendi* are not implicated. See *People* v. *Montoya*, supra, *6–7; *State* v. *Calloway*, supra, 14; *State* v. *Allen*, supra, 47–48.

Even if I were to assume that the prior conviction exception should be extended to facts that arise from and are so essentially analogous to a prior conviction, the exception nonetheless would be inapplicable in the present case. Here, the defendant's sentence was enhanced based on the fact that he was released on bond after an arrest at the time when the present offenses were committed. This fact plainly did not arise from a prior conviction. Further, this fact cannot be said to be essentially analogous to a prior conviction because the substantial procedural safeguards that attach to the factual finding of a prior conviction, namely, the rights to a jury trial and to have the state prove the relevant facts beyond a reasonable doubt, do not attach to a factual finding of a defendant's release status after an arrest. Cf. *United States* v. *Tighe*, 266

F.3d 1187, 1194 (9th Cir. 2001) (concluding that " 'prior conviction' exception to *Apprendi*'s general rule *must be limited to prior convictions that were themselves obtained through proceedings that included the right to a jury trial and proof beyond a reasonable doubt*" [emphasis added]); *State* v. *Brown*, 879 So. 2d 1276, 1290 (La. 2004) (concluding that juvenile adjudication does not fall within prior conviction exception because it "is not established through a procedure guaranteeing a jury trial"); but cf. *United States* v. *Jones*, 332 F.3d 688, 696 (3d Cir. 2003) (juvenile adjudication may fall within prior conviction exception if defendant was accorded "all the procedural safeguards that he [was] constitutionally due"); *United States* v. *Smalley*, 294 F.3d 1030, 1032–33 (8th Cir. 2002) (same). Accordingly, I conclude that the due process and sixth amendment concerns at issue in *Apprendi* would be implicated by a trial court's factual finding of the defendant's release status after an arrest.

The majority opinion also relies on *Ryle* v. *State*, 842 N.E.2d 320, 325 (Ind. 2005), in which the Indiana Supreme Court advanced an alternative reasoning for determining that the trial court could find that the defendant was on probation at the time his subsequent offense was committed. The court in *Ryle* noted that the United States Supreme Court in *Shepard* v. *United States*, 544 U.S. 13, 125 S. Ct. 1254, 161 L. Ed. 2d 205 (2005), reaffirmed the use of certain documents by the trial court to determine the character of a prior conviction for the purpose of determining whether a sentence enhancement applies. *Ryle* v. *State*, supra, 324–25. The court in *Ryle* concluded that the trial court properly had found that the defendant was on parole based on references in a presentence investigation report to case files from courts in which the defendant was convicted because these type of judicial records bear the same

hallmark of conclusive significance as those enumerated in *Shepard.* Id., 325.

I am not persuaded that the *Shepard* decision provides a basis on which a trial court constitutionally can find the fact of the defendant's release status after an arrest under § 53a-40b. In *Shepard* v. *United States,* supra, 544 U.S. 16, the defendant entered a plea of guilty to possessing a firearm as a felon in violation of 18 U.S.C. § 922 (g) (1). Because the defendant had four prior convictions under a Massachusetts state burglary statute, the government sought to apply the Armed Career Criminal Act (act), 18 U.S.C. § 924 (e), which requires a minimum fifteen year sentence for anyone possessing a firearm after three prior convictions for violent felonies, and the act makes burglary a violent felony if it was committed in a building or enclosed space. Id., 15–16. Because the Massachusetts burglary statute was more expansive than the definition of burglary under the act, the government urged the District Court judge to consider police reports that were submitted with complaint applications in order to show that the burglaries were committed in a building or enclosed space. Id., 17.

The court in *Shepard* reaffirmed its decision in *Taylor* v. *United States,* 495 U.S. 575, 602, 110 S. Ct. 2143, 109 L. Ed. 2d 607 (1990), in which it had allowed District Courts, in order to determine whether the prior convictions necessarily fell within the act's definition of burglary, to refer to the charging documents filed in the court of conviction and recorded judicial acts, such as the jury instructions, that could have limited the conviction to the type of burglary defined in the act. *Shepard* v. *United States,* supra, 544 U.S. 20. In order to encompass the scenario wherein the prior convictions arose from either a bench trial or a guilty plea, the *Shepard* court expanded the documents to which the District Court can refer to include: the judge's rulings

of law and finding of facts; the transcript of the plea colloquy or the written plea agreement; and any finding of facts adopted by the defendant upon entering his or her plea. Id. The court did, however, reject the government's use of police reports because they go "beyond conclusive records made or used in adjudicating guilt . . . ." Id., 21. Instead, the court noted that the inquiry must be confined to reference to judicial records "of the convicting court approaching the certainty of the record of conviction in a [state that defines burglary in the same manner as the act]." Id., 23. Finally, Justice Souter, writing for four members of the court, noted that the court's recent decision in *Apprendi* also required that the District Court's inquiry be limited to judicial records that contain facts that *necessarily* had to be found by the convicting court. Id., 24–26. Justice Thomas, who concurred in the judgment of the court, took the position that any factual inquiry by the District Court into the judicial records of the defendant's prior convictions was unconstitutional under *Apprendi*. Id., 26–28.

Turning to the present case, I cannot conclude that *Shepard* provides any support for a trial judge to find, on the basis of a record contained in a court file, the fact that a defendant was released on bond from an arrest on a specific date. Unlike the types of judicial records discussed in *Shepard*, such a judicial record was not "made or used in adjudicating guilt"; id., 21; and the facts contained in such a record were not necessarily found by a convicting court. Accordingly, such a fact does not approach the certainty of a prior conviction.[4]

---

[4] The majority opinion also relies on *State* v. *Sanko*, 62 Conn. App. 34, 42, 771 A.2d 149, cert. denied, 256 Conn. 905, 772 A.2d 599 (2001), in which the Appellate Court concluded that the defendant was not deprived unconstitutionally of a jury trial on whether his sentence could be enhanced under § 53a-40b. The basis for the Appellate Court's decision was twofold. First, the court concluded that no jury trial was required because there was no issue of fact. Id., 43. Specifically, the court noted that the defendant's counsel

Other courts, as the majority also correctly notes, have refused to extend the prior conviction exception to apply to facts such as the defendant's parole or probation status. See, e.g., *State* v. *Wissink*, 172 N.C. App. 829, 837, 617 S.E.2d 319 (2005) (concluding that, although probationary status is not far removed from prior conviction, rule set forth in *Apprendi* requires this fact to be found by jury and noting that fact of probationary status "did not have the procedural safeguards of a jury trial and proof beyond a reasonable doubt recognized in *Apprendi* as providing the necessary protection for defendants at sentencing"); *State* v. *Perez*, 196 Or. App. 364, 371–73, 102 P.3d 705 (2004) (concluding that fact defendant was on parole or probation was related to prior conviction, but procedural safeguards discussed in *Apprendi* did not apply to this fact, and, therefore, fact must be proved to jury beyond reasonable doubt), rev'd on other grounds, 340 Or. 310, 131 P.3d 168 (2006); *State* v. *Jones*, 126 Wash. App. 136, 142–46, 107 P.3d 755 (2005) (concluding that whether defendant was in community placement at time offense committed does not fall within prior conviction exception because procedural safeguards of fact of prior conviction are not applicable and rejecting view that prior conviction exception should be viewed to encompass facts related

---

conceded at the sentencing hearing that the defendant was released on a written promise to appear following a conviction for a prior crime when he committed the subsequent offense. Id. Second, the court also determined that the due process and sixth amendment concerns were mitigated because of the defendant's concession regarding his prior conviction. Id., 44–45.

The present case is distinguishable from *Sanko* because the defendant has not conceded that he was released on bond from an arrest at the time he committed the offenses with which he is charged. In his brief in this court, the defendant claims never to have stipulated as to his status at the time of the present offenses. Further, my review of the record in the present case reveals that, although the defendant, during his sentencing hearing, made numerous allusions to his prior arrest for disorderly conduct, he did not admit explicitly that he was, in fact, released on bond on the date of the subsequent offenses.

to past conviction because *Apprendi* plainly stated that exception was narrow).

Although the majority generally characterizes these decisions refusing to expand the prior conviction exception as formalistic, I believe that these courts properly limited this exception to the fact of prior conviction because the *Apprendi* court firmly stated that it was carving out only a narrow exception from its general rule requiring a jury finding of the sentence enhancing facts. Not only did the court refer to *Almendarez-Torres*, the decision on which the exception is based, as "at best an *exceptional* departure from the historic practice" regarding criminal proceedings; (emphasis added) *Apprendi* v. *New Jersey*, supra, 530 U.S. 487; it also stated its doubts regarding the correctness of this decision. Id., 489–90 and n.15; see also *Shepard* v. *United States*, supra, 544 U.S. 27–28 (Thomas, J., concurring) (noting that *Almendarez-Torres* has been eroded by court's sixth amendment jurisprudence and majority of court now believes it was decided wrongly). On the basis of these reservations, the court explicitly stated that the exception it was creating to accommodate the *Almendarez-Torres* decision was a *"narrow exception . . . ."* (Emphasis added.) *Apprendi* v. *New Jersey*, supra, 490; see also *United States* v. *Tighe*, supra, 266 F.3d 1194 (noting that "*Apprendi* [c]ourt's serious reservations about the reasoning of *Almendarez-Torres* counsel against any extension" of prior conviction exception).

The majority opinion does, however, construe some of these decisions as adopting what it describes as a "context driven approach," wherein a jury trial would be required only if the relevant inquiry was of the type of "complicated and intensively factual inquiry that clearly

would fall within the jury's traditional province."[5]
Employing this context driven approach, the majority
concludes that the fact of whether the defendant was
released on bond after an arrest at the time of the
subsequent offenses need not be tried to a jury because

---

[5] The majority identifies *State* v. *Jones*, supra, 126 Wash. App. 136, and *Markwood* v. *Renard*, 203 Or. App. 145, 125 P.3d 39 (2005), as employing a context driven approach to determine whether a jury finding was necessary based on the complexity and intensively factual nature of the inquiry. I cannot agree that these courts employed such an analysis. In *Jones*, the court concluded that the fact that the defendant was in community placement does not fall within the prior conviction exception because the facts necessary to make this finding were contained in department of correction records and not within the judgment or sentence of the prior conviction. *State* v. *Jones*, supra, 143–44. Thus, the *Jones* court concluded that the facts contained within these records do not fall within the prior conviction exception because they "do not bear the same procedural protections as facts necessarily determined by the jury's verdict." Id., 145. Accordingly, I cannot agree that the *Jones* court's decision was based on the "complicated and intensively factual inquiry" into the defendant's status as being in community placement at the time of the offenses. Rather, the fact of the defendant's status as being in community placement did not fall within the prior conviction exception because the procedural protections that apply to the fact of conviction do not apply to department of correction records.

In *Markwood* v. *Renard*, supra, 203 Or. App. 150, the court concluded that the defendant was entitled to a jury finding regarding an increased sentence based on his probationary status at the time he committed the offenses with which he was charged even though the defendant admitted that he was on probation at that time. The court reasoned that, under Oregon law, "an upward departure sentence based on a defendant's supervisory status requires further inferences about the malevolent quality of the offender and the failure of his [supervisory] status to serve as an effective deterrent . . . ." (Internal quotation marks omitted.) Id. Because the defendant did not admit to those further facts, the court concluded that the defendant was entitled under *Apprendi* to a jury finding of those additional facts. Id. The court did not consider whether a jury would have been required to find the fact that the defendant was on probation if he had not admitted to that fact. The court did, however, cite to its prior decision in *State* v. *Perez*, supra, 196 Or. App. 371–72, in which it had concluded that the fact that the defendant was on parole or probation does not fall within the prior conviction exception because this fact "has not been proved to a jury beyond a reasonable doubt, so the same 'procedural safeguards' had not attached to that 'fact' . . . ." Accordingly, I cannot conclude that the Oregon Court of Appeals has adopted such a context driven approach to determining when a jury finding is required under *Apprendi*.

it can be proven easily by reference to a court file. The majority noted that "once the defendant was convicted under part A of the information, demonstrating that he had committed the crimes charged on the date specified, the only issue left open—whether he was on release from an arrest at the time—properly could have been the subject of judicial notice." I agree that evidence found in a court file likely would be able to answer the factual question of the defendant's status and such evidence is amenable to judicial notice. See *McCarthy* v. *Warden*, 213 Conn. 289, 293, 567 A.2d 1187 (1989) ("[w]e may . . . take judicial notice of the court files in another suit between the parties, especially when the relevance of that litigation was expressly made an issue at this trial"), cert. denied, 496 U.S. 939, 110 S. Ct. 3220, 110 L. Ed. 2d 667 (1990); *State* v. *Sanko*, 62 Conn. App. 34, 42, 771 A.2d 149 (noting that court may take judicial notice from judicial record of defendant's status vis-á-vis criminal justice system under § 53a-40b), cert. denied, 256 Conn. 905, 772 A.2d 599 (2001). Nevertheless, the ease of proof does not mean that no factual inquiry is necessary where the parties contest that fact. See *Ohio Bell Telephone Co.* v. *Public Utilities Commission*, 301 U.S. 292, 301, 57 S. Ct. 724, 81 L. Ed. 1093 (1937) ("[judicial] notice, even when taken, has no other effect than to relieve one of the parties to a controversy of the burden of resorting to the usual forms of evidence"); see also *Jacobs* v. *Healey Ford-Subaru, Inc.*, 231 Conn. 707, 730 n.24, 652 A.2d 496 (1995) ("doctrine of judicial notice excuses the party having the burden of establishing a fact from introducing formal proof of the fact" [internal quotation marks omitted]).

Further, the majority's reasoning, which hinges the right to a jury trial on the ease by which the underlying fact may be proven, finds no support in *Apprendi*. As we have noted previously herein, the court in *Apprendi* did not except the fact of prior convictions from the

general rule requiring jury fact-finding because the fact of prior conviction was easily proven by reference to a court file; rather, the court incorporated this exception because of the procedural safeguards that attached to the fact of conviction and the reality that the defendant in *Almendarez-Torres* did not contest the fact of his prior conviction. *Apprendi* v. *New Jersey*, supra, 530 U.S. 488. Indeed, the *Apprendi* court's dictum intimating that a jury finding would be required, under its reasoning, if the fact of prior conviction had been contested in *Almendarez-Torres*[6] undermines the majority opinion's reasoning because the fact of prior conviction could also have been proven easily by reference to the court file. As the Arizona Court of Appeals stated, "[u]nder *Apprendi*, it is a defendant's exposure to additional punishment, not the ease or accuracy with which that fact can be determined by a trial court, that is pivotal in triggering a defendant's right to have a jury decide." *State* v. *Gross*, supra, 201 Ariz. 45.

Finally, I do not believe that it would be appropriate to limit the defendant's right to a jury trial on the basis of the majority opinion's context driven approach because it would require this court to engage in a subjective analysis of how complicated or easy a given fact would be to prove and it is this type of subjective inquiry regarding the outer contours of the sixth amendment's right to a jury trial that the United States Supreme Court disapproved of in *Blakely* v. *Washington*, supra, 542 U.S. 296. In *Blakely*, the court expressly rejected the view that legislatures should be allowed to, *within certain limits*, establish that certain factors are to be considered sentencing factors found by the trial court. Id., 307. The court noted that this view would mean, in operation, "that the law must not go too far—it must not exceed the judicial estimation of the proper role of the judge." Id. The court rejected the notion that the

---

[6] See footnote 3 of this opinion.

sixth amendment contains this subjective standard, as opposed to the bright line rule of *Apprendi.* Id., 308. The court stated that the right to a jury trial "is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." Id., 305–306. Accordingly, the court expressed its doubt "that the [f]ramers would have left [the] definition of the scope of jury power up to judges' intuitive sense of how far is *too far.*"[7] (Emphasis in original.) Id., 308. In the context of the majority's opinion, I must conclude that the framers also would not have wanted to limit the right to a jury trial based on a judge's intuitive sense of how easy or complicated a given fact would be to prove.

I therefore conclude that, in the present case, if the defendant had not entered a guilty plea, he would have been entitled to a jury finding regarding whether he was released on bond from an arrest at the time he committed the crimes charged in part A of the information. Accordingly, by pleading guilty to the sentence enhancement under § 53a-40b, the defendant waived the same rights that were discussed in *Boykin* v. *Alabama,* 395 U.S. 238, 243, 89 S. Ct. 1709, 23 L. Ed. 2d

---

[7] Indeed, the framers had expressed the fear that "the jury right could be lost not only by gross denial, but by erosion." (Internal quotation marks omitted.) *Apprendi* v. *New Jersey,* supra, 530 U.S. 483. As the United States Supreme Court noted in *Jones* v. *United States,* supra, 526 U.S. 248, "[o]ne contributor to the ratification debates . . . commenting on the jury trial guarantee in [article three, § 2, of the United States constitution] . . . warn[ed] of the need 'to guard with the most jealous circumspection against the introduction of new, and arbitrary methods of trial, which, under a variety of plausible pretenses, may in time, imperceptibly undermine this best preservative of LIBERTY.' " Accordingly, even though the present case presents a question that admittedly challenges the sixth amendment right to jury trial on the margins, I believe that this court should nonetheless view any expansion of the prior conviction exception with the most jealous circumspection.

274 (1969), namely, his fifth amendment privilege against self-incrimination and his sixth amendment rights to a jury trial and to confront his accusers. To waive such fundamental constitutional rights validly under the due process clause, the waiver must be "an intentional relinquishment or abandonment of a known right or privilege." (Internal quotation marks omitted.) *McCarthy* v. *United States*, 394 U.S. 459, 466, 89 S. Ct. 1166, 22 L. Ed. 2d 418 (1969). I therefore conclude that, if a trial court fails to canvass adequately the defendant to ensure that the defendant knowingly and voluntarily entered a guilty plea to part B of an information charging the defendant with a sentence enhancement under § 53a-40b, such a guilty plea is obtained in violation of due process and is therefore voidable.

An examination of the record in the present case reveals that the trial court made no effort to ascertain whether the defendant's guilty plea was made knowingly and voluntarily. The complete exchange between the court and the defendant consisted of the court directing the clerk to put the defendant to plea on part B of the information, the clerk informing the defendant that he was charged under part B of the information with violating § 53a-40b and asking the defendant how he wished to plead, and the defendant responding that he pleaded guilty. Thus, the record in the present case does not reveal any facts from which a reasonable conclusion could be drawn that the plea was made knowingly and voluntarily. Accordingly, I conclude that there was a clear violation of the defendant's constitutional rights because his guilty plea to part B of the information did not comply with constitutional standards.[8] See *Boykin* v. *Alabama*, supra, 395 U.S. 242 ("[i]t was error,

---

[8] Because the defendant's claim was unpreserved, he can prevail on this claim only if he satisfies the four-pronged test set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Under *Golding*, the defendant can prevail on this claim only if the following conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3)

plain on the face of the record, for the trial judge to accept [the] petitioner's guilty plea without an affirmative showing that it was intelligent and voluntary"); *State* v. *Bugbee*, 161 Conn. 531, 535–36, 290 A.2d 332 (1971) (concluding that, because trial court record was completely silent as to whether defendant's guilty plea was knowing and voluntary, plea was not in compliance with constitutional standards). The defendant should therefore be given the opportunity to withdraw his plea.

I therefore respectfully dissent.

the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id. I agree with the majority opinion that the first two prongs were satisfied. Because I conclude that the trial court's failure to canvass adequately the defendant was a clear constitutional violation, I conclude that the third prong of *Golding* was satisfied. Under the fourth prong of the *Golding* analysis, the state bears the burden of proving that the constitutional error was harmless beyond a reasonable doubt. See *State* v. *Estrella*, 277 Conn. 458, 477, 893 A.2d 348 (2006); *State* v. *Faust*, 237 Conn. 454, 470, 678 A.2d 910 (1996). In the present case, the state has failed to meet its burden because it did not argue, in its brief in this court, that the constitutionally inadequate canvass was harmless beyond a reasonable doubt.